**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**ASHLAND**

Civil Action No. 20-14-HRW

TIMOTHY SMITH,                                                    PLAINTIFF,


v.                          **MEMORANDUM OPINION ORDER**


BOYD COUNTY FISCAL COURT,
WILLIAM HENSELY, *in his Official Capacity*
*as Boyd County Jailer*
and *in his Individual Capacity,*                              DEFENDANTS.


This civil action arises from an assault which occurred at the Boyd County Detention

Center on February 2, 2019. Jeremy Nethercutt, an inmate, assaulted Timothy Smith, another

inmate. Smith claims that the assault resulted from Jailer William Hensley and the Boyd Count

Fiscal Court's deliberate indifference to his safety in violation his Constitutional rights. For the

reasons set forth herein, the Court finds that the Defendants are entitled to judgment as a matter

of law.

**I.**

**A. BCDC's Policies**

The crux of Plaintiff's claim is that the intake and classification policies of the Boyd

County Detention Center ("BCDC") were not properly implemented with regard to Nethercutt.

The Intake Policy states:

> Upon intake into the Boyd County Detention Center and upon
> completion of observation for serious injury or illness, proper

1

> admission documentation of authority identification, the initial
> booking and intake process will begin.
>
> ….
>
> Procedure (4): If admitted prisoners do not meet requirements for
> intake housing and need assignment to permanent house, the search
> and permanent classification procedure shall be followed.

[Docket No. 24-1, p. 1].

> The Classification policy provides:
>
> > For the preservation of the security and order of the Detention
> > facility, its staff and inmates, every inmate will be classified upon
> > admission to the facility and shall be assigned housing according to
> > the classification. There shall be no discrimination by race, color,
> > creed, or national origin.
> >
> > ….
> >
> > (2) Classification: The Detention officer shall then assign a
> > classification code based on a points-based system to the inmate
> > during booking process. (3) The classification code shall be logged
> > into the inmates booking information sheet in jail tracker as well as
> > in the classification report in jail tracker…
> >
> > (5) Review: the Jailer or his designee shall review all classification
> > assignments daily.

*Id.* at p. 2-3.

The process involved an assessment of several factors, including, the nature of the inmate's offense, their history of violent or disruptive behavior, mental or physical disability, history of disciplinary issues, and suicidal tendencies. [Docket No. 15-4].

Upon arrival at the BCDC, inmates are assessed and interviewed. *Id.* Officers guide inmates through a written questionnaire composed of a series of "Yes or No" questions about their criminal, medical, and behavioral history. [Docket No. 15-2]. The Officer enters the

information into Jail Tracker, a software system.  The software, using a predetermined formula, then designates the inmate as minimum, medium, or high risk for security purposes. *Id.*  This information is entered onto the Facility Admissions Report. This classification assignment is used to determine the inmate's housing assignment.

## B. Jeremy Nethercutt

At the time of the assault in early 2019, Jeremy Nethercutt was no stranger to the BCDC. He was arrested on May 27, 2018, for three counts of possession of a controlled substance and tampering with evidence. [Docket No. 15-10]. Following the arrest, he was transported to the BCDC and, shortly thereafter, Officer Zachary Hunter conducted the booking interview. [Docket No. 15-2]. Nethercutt reported no prior history of violent behavior, indicated that he had never required separation from other inmates during prior incarcerations, and denied having thoughts of harming himself or others. *Id.* Additionally, Officer Hunter noted that Nethercutt did not have an institutional history of alerts or issues. *Id.*  The "Classification:" line on the Facility Admissions Report is blank. *Id.* A month later, he was transferred to Greenup County and released. [Docket No. 15-11].

Nethercutt was charged as a fugitive from another state and was re-booked at the BCDC on July 29, 2018.  [Docket No. 15-12]. During the booking interview, he denied any violent criminal history or thoughts of harming himself and/or others. *Id.*  As reflected on the Standard Medical Questions form,  Nethercutt was  asked if he was aware of any reason he should be separated from another inmate while incarcerated, and he responded in the affirmative. [Docket No. 24-13].  He denied ever requiring separation from another inmate while incarcerated at another facility. *Id.* The interviewing officer, Amanda Osborne, responded "no" to the question of whether she believed he should be referred to a supervisor for review and also answered "no"

to whether there was any indication that he was acting so negatively that he may engage in self-harm. *Id.* The "Classification:" line on the Facility Admissions Report is blank. [Docket No. 15-12]. He remained at the BCDC for approximately two weeks until he was released on bond on August 14, 2018. [Docket No. 15-14].

On August 31, 2018, Nethercutt was back at the BCDC after being picked up on an outstanding warrant. [Docket No. 15-15]. Nethercutt again underwent a full booking interview and, again, he denied any violent criminal history or thoughts of harming himself and/or others. [Docket No. 15-16].  As reflected on the Standard Medical Questions form,  he again answered in the affirmative when asked if there was a reason he should be separated from another inmate while incarcerated. [Docket No. 24-5].  Contrary to his response three days earlier, when asked if had ever required separation from another inmate while incarcerated in another facility, he responded in the affirmative. *Id.*  The interviewing officer, John Payne*, responded "no" to the question of whether she believed he should be referred to a supervisor for review and also answered "no" to whether there was any indication that he was acting so negatively that he may engage in self-harm. *Id.* The "Classification:" line on the Facility Admissions Report is marked "NOT SPECIF". *Id.*   Nethercutt remained at the BCDC for approximately a week until his release to Drug Court. [Docket No. 15-17].

Nethercutt last admission to the BCDC prior to the assault which forms the basis for this civil action was on December 12, 2018.  As reflected on the Standard Medical Questions form, Nethercutt was asked if he was aware of any reason, he should be separated from another inmate while incarcerated, and he responded "no". [Docket No. 24-7].  Contrary to his August 2018 intake but consistent with his July 2018 intake, he denied ever requiring separation from another inmate while incarcerated at another facility. *Id.* The interviewing officer, Amanda Osborne*,

responded "no" to the question of whether she believed he should be referred to a supervisor for review and also answered "no" to whether there was any indication that he was acting so negatively that he may engage in self-harm. *Id.* The "Classification:" line on the Facility Admissions Report is blank. [Docket No. 24-4].

The is no evidence in the records which establishes or suggests that Nethercutt had any disciplinary issues during his multiple incarcerations at the BCDC prior to the assault.

## C. Timothy Smith

Smith, too, had a long history of both misdemeanor and felony offenses. [Docket No. 15-7]. Relevant to this civil action, on January 24, 2019, Ashland Police arrested him for shoplifting at Kohl's. [Docket No. 15-6]. Upon arrival at the BCDC, underwent the intake procedure without issue. [Docket No. 15-8 and Deposition of Timothy Smith, Docket No. 17, p. 45]. Based on the information provided and obtained during Smith's classification interview, Smith was classified as a minimum-security risk. *Id.* He was initially assigned to a temporary "assessment" cell for observation by BCDC personnel. *Id.* at p. 46. During that time, he was housed with approximately 12 to 18 other inmates without issue. *Id.* On January 27, 2019, Smith was moved to Cell H. *Id.* at p. 47.

## D. Cell H

Jeremy Nethercutt was among the inmates in Cell H. Smith testified that he and Nethercutt did not know each from any prior incarcerations. *Id.* at 54.

Within hours of his transfer to Cell H, Smith requested to be moved. *Id.* at 49-50. Smith testified that he wanted a transfer because Nethercutt told him that he "was going to have to fight or check out." *Id.* at 50. Nethercutt directed Smith not to sleep in the bunk next to him because he had heard that Smith was a "rat" from another inmate, Justin Watts. *Id.* at p. 49. Apparently,

Smith made a statement against Watts in a case ten years prior that earned Smith the "rat" label. *Id.* at 60.

Smith pushed the call button in the cell and asked BCDC staff to move him. *Id.*  He testified to what occurred when BCDC staff arrived at the cell:

> Q. So when you pushed the button, the deputy came, and what did you say to the deputy?
>
> A. Actually three deputies, I think three deputies came. I basically just asked them to move me, and they was like, well, what's going on? and they was just -- the group in the cell were saying, well, we don't want to live with a rat, and just other remarks. And one of the deputies said, well, you know, just because somebody across the hall said he's a rat, doesn't mean that he is. And told him that they -- if they laid any hands on me, that they would get in trouble. And, you know, they said, well, we can't promise anything. But -- and then eventually they said, whoever was the highest up in charge that night said that I wasn't going to get moved, and then they left.
>
> …
>
> Q. Did they ask you why you wanted to be moved?
>
> A. They didn't really ask me why, but the inmates were telling them why. They were just - they didn't want to live with a rat, you know, and it was either I might have to fight them -- they was going to get me out of that cell one way or the other.
>
> Q. And the deputies then, I understand did two things, they admonished the inmates and said, don't touch him, or you are going to get in trouble. And they also said, hey, just because someone said he is a rat, doesn't mean he is?
>
> A. Correct.

*Id.* at 51-52.

It is unclear whether Smith's oral request for a transfer was reported to any supervisor or whether it was officially considered. Smith testified that the deputies with whom he spoke denied

the request. *Id.* at 58.  Smith did not file a grievance about his placement, nor did he tell BCDC

that he feared for his safety. *Id*. at 49, 59.   In his response in written discovery, however, Smith

stated he requested the transfer due to threats from Watts, who was not in Cell H, and Nethercutt.

[Plaintiff's Responses to Interrogatory No. 12, Docket No. 24-8].  The BCDC staff involved in

this exchange are not parties to this lawsuit, not does the record contain their sworn testimony.

According to Smith, he and Nethercutt had no interactions following this initial exchange

in the seven days which followed. *Id.* at 57.  Smith testified that during this time, Nethercutt did

not threaten or exhibit violent behavior toward Smith.  *Id.* at 58. Smith also testified that "there

was nothing about [Nethercutt] that led him [Smith] to believe that [Nethercutt] was threatening

other inmates." *Id*.

### E. February 2, 2019

The events leading up to the assault as well as the assault itself are depicted on

surveillance video, the entirety of which is filed in the record at Docket No. 19.

On February 2, 2019, Watts entered Cell H for a video visitation due to defective

equipment in his own cell. *Id.* at 63.  At some point, Watts and Smith got into a scuffle which

resulted in Watts shoving Smith to the ground.  [Docket No. 19 at 13:22:49 - 13:23:0523]. Smith

was not injured.  The two continued to exchange words from across the cell.  *Id.* at 13:23:05 –

13:24:00.  Then, Nethercutt came behind Smith  and "sucker punched" him *Id.* at 13:24:00 -

13:24:05. Smith testified he was punched "for no apparent reason."  Docket No. 17 at p. 77.

Smith then crawled to the door of his cell pushed the call button and told BCDC staff that

he needed to go to the hospital. *Id.* at 79.  Fifty minutes later, Major Gus Guzman arrived at Cell

H. *Id.* at 82-83. Guzman asked what happened; Smith told Guzman he had slipped in the shower.

*Id.* at 83. Smith testified that Nethercutt and other inmates told him to tell the BCDC he slipped in the shower. *Id.* at 79. Smith testified he did so because he was afraid. *Id.* at 83.

Mr. Smith was transported to King's Daughter's Medical Center for evaluation of his injuries. Smith told medical staff that he had accidentally fallen in the shower. *Id.* at 84-85. He did however tell Lt. Darren Wilson, the BCDC officer that was with him at the hospital, that he had been assaulted by Nethercutt. *Id*. at 88-89. Lt. Wilson's incident report states, "[i]nmate Smith told me that his facial injuries were the result of a "sucker punch" from fellow cell mate Jeremy Nethercutt." [Docket No. 24-9]. Lt. Guzman also noted in the report that he "received a call from Lt. Wilson advising that Nethercutt also was involved in this assault." *Id.*

Upon review of video surveillance, Lt. Wilson determined that Justin Watts and Jeremy Nethercutt had assaulted Smith. *Id.* Watts and Nethercutt were put in isolation for thirty (30) days. *Id.*

### III.

On January 24, 2020, Smith filed suit against Jailer Hensley and the Boyd County Fiscal Court seeking damages as the result of Nethercutt's alleged assault. Smith asserted a claim of deliberate indifference to his safety in violation of 42 USC § 1983 against Jailer Bill Hensley, individually and in his official capacity, and against the Boyd County Fiscal Court. [Complaint, Docket No. 1-1]. Smith also asserts claims of negligence against Hensley and the Fiscal Court. *Id.* Although Nethercutt and "Unknown Defendants" are included in the caption of the Complaint, none were joined to the lawsuit.

The civil action was removed to this Court. The parties conducted discovery and Defendants seek summary judgment as to all claims alleged herein.

### IV.

8

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

9

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

**V.**

Smith asserts §1983 claims against the Boyd County Fiscal Court and Hensley in his official capacity as Boyd County Jailer.

As Defendants point out, the Boyd County Fiscal Court is not an entity *sui juris* – it is merely a sub-unit or instrument of Boyd County. *Sargent v. City of Toledo Police Dep't,* 150 Fed. Appx. 470 (6th Cir. 2005). As such, the claims against it fail as a matter of law and summary judgment is warranted.

**A. Boyd County**

"Official-capacity suits ... 'generally represent [ ] another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436

U.S. 658, 691 n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Thus, Plaintiff's official-capacity claims against Hensley are also against Boyd County.

When a § 1983 claim is made against a county or municipality, the Court must analyze two distinct issues: (1) whether Plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the county or municipality is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). "A municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). To demonstrate municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

It is important to note that Plaintiff is not alleging that the policies of the BCDC are in and of themselves unconstitutional or otherwise improper. Rather, he asserts that the failure to follow the policies resulted in his injury. However, failure to follow policies, without more, does not establish a constitutional violation for which a municipality is liable. *See generally, Gray v. City of Detroit*, 399 F.3d 612, 618 (6th Cir. 2005) ("[R]easonable policies . . .negligently administer[ed] do not give rise to § 1983 liability'). *See also, Griffith* v. *Franklin County*, 975 F.3d 554, 578 (6th Cir. 2020).

Nor has Plaintiff established evidence of a custom of constitutionally infirm behavior. To establish municipal liability based on a custom, a Plaintiff must show: (1) the existence of a clear and persistent pattern of the complained-of behavior; (2) notice or constructive notice on the part of the county; (3) the county's tacit approval of the unconstitutional conduct, such that its

deliberate indifference in its failure to act can be said to amount to an official policy; and (4) that the county's custom was the moving force or direct causal link in the constitutional deprivation. *Shepherd v. Floyd County*, 2016 WL 3093936 (E.D. Ky. 2016) (citations omitted).

There is no evidence of a clear and persistent pattern of Boyd County deputy jailers failing to follow the jail's classification policy. At best, there is evidence that, with respect to Nethercutt, deputy jailers neglected to follow the classification policy by, among other things, failing to completely document his intake processes.  However, there is no evidence that the alleged failure to follow the classification policy is "so permanent and well settled as to constitute a custom or usage with the force of law."  *Monell*, 436 U.S. at 690. Moreover, there is no evidence that Boyd County was on notice of the alleged custom, or any evidence to suggest that Boyd County tacitly approved of the alleged custom.

In an effort to prove a custom or practice of  failing to follow the intake and classification processes which resulted in risking inmate security at the BDCD, Smith relies on a report that the United States Department of Justice authored ("Report") following its investigation of the Boyd County Detention Center in 2016. A copy of the report is in the record at Docket No. 24-14. However, the report is irrelevant to Smith's claims.   Although the Report was issued shortly after the assault, on February 28, 2019, it is based on information the Department of Justice derived from having reviewed incident reports dated between March 2016 and November 2016 and its site visit which occurred from November 14-17, 2016.  That period predates Nethercutt's assault of Smith in the BCDC by almost three years. Therefore, any conclusions in the Report are not reflective of conditions at the BCDC in February 2019 and are  irrelevant to Smith's claims.

Further, the Report itself states that it cannot be used for the purpose Plaintiff proposes. It specifically provides: "The Department [of Justice] does not serve as a tribunal authorized to

make factual findings and legal conclusions, and nothing in this Notice should be construed as a factual finding or legal conclusion. Accordingly, this Notice is not intended to be admissible evidence and does not create and legal rights or obligations." [Docket No. 24-14, p. 5].

Therefore, Smith has not overcome summary judgment pertaining to his federal claims against Boyd County.

## B. William Hensley in his official capacity

As Defendants point out, Smith's §1983 claim against Hensley is premised upon his position as supervisor.  In his Complaint, Smith asserts that Hensley is "liable on official bond for the conduct of his deputies." [Docket No. 1-1, ¶ 5].

It is well established that the doctrine of *respondeat superior* does not apply in the context of § 1983. *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658 (1978). The Sixth Circuit has explained, "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Reed v. Speck*, 508 F. App'x 415, 421 (6th Cir. 2012) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)) (internal quotation marks omitted). To prove liability, the plaintiff must demonstrate "[m]ore than simple negligence and a right to control employees." *Id.* (citing *Gregory*, 444 F.3d at 751). "To succeed on a failure to train or supervise claim, a plaintiff must show that the supervisor 'encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 712–13 (6th Cir. 2001)).  In other words, the plaintiff "must prove that [the supervisors] did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory*, 444 F.3d at 751 (citation omitted).  Accordingly, the Sixth Circuit has declined to impose supervisory liability where the supervisor-defendant was unaware of his employees' allegedly unconstitutional conduct and

there was no evidence to show his direct participation or encouragement. *See Reed v. Speck*, 508 F. App'x 415, 421 (6th Cir. 2012).

The record is devoid of any evidence that Hensley directly participated in, authorized, acquiesced, or actively encouraged any behavior during the booking and classification of Nethercutt or Smith. Indeed, Smith concedes that Hensley's only role was that of supervisor. As such, Smith's claim against Hensley in his official capacity fails as a matter of law.

## VI.

The Court now turns to Plaintiff's §1983 against Hensley in his individual capacity. As discussed *supra*, Hensley's alleged failure to follow the policies of the BCDC is not enough to support a finding of §1983 liability.

Although not specifically asserted,  viewing the facts in a light most favorable to Smith, his claim against Hensley in his individual capacity sounds in failure-to-protect.  As a pretrial detainee, his claim is analyzed under the Fourteenth Amendment. *Brawner v. Scott County*, 14 F.4th 585, 591 (6th Cir. 2021).  *See also Trozzi v. Lake County, Ohio*, 2022 WL 909411, *7 (6th Cir. 2022).

To raise a cognizable constitutional claim for failure to protect, an inmate must make a two-part showing: (1) he was incarcerated under conditions which posed a serious risk to his safety; and (2) the defendant officer was aware of the risk and did not take reasonable steps to abate it. *Farmer*, 511 U.S. at 834.  The second prong of the inquiry  "require[s] only recklessness," that is, " 'more than negligence but less than subjective intent — something akin to reckless disregard." *Brawner*, 14 F.4th at 591.  *See also Trozzii* at *7.  In *Trozzi*, the Sixth Circuit recognized the "high bar" for constitutional torts grounded in a due process violation. *Id.*

14

(internal citations omitted).  The *Trozzi* Court refined *Brawner's* analyses to something more akin to "purposeful knowing." *Id*.

Smiths claim fails at both steps of the analysis. First, he has not established that he was incarcerated in conditions in which he was at risk of harm.  Although Nethercutt had been in the Boyd County Detention Center five times prior to the admission during which he assaulted Smith and had been in the Boyd County Detention Center for two months during his sixth admission, Nethercutt had never been involved in any disciplinary incident, much less a violent one. Moreover, none of his arrests were for any violent conduct. There simply was no reason for anyone at the BCDC, let alone Hensley, to think Nethercutt might assault another inmate.

Smith relies upon the discrepancies in Nethercutt's responses during his booking interviews.  Specifically, on August 31, 2018, Nethercutt indicating that he should be separated from another inmate at the Boyd County Detention Center, that he required separation from another inmate at another detention facility, and that he had a history of protective custody. Whereas on December 12, 2018, Nethercutt indicated that did not need to be kept apart from another inmate.  Smith's conclusion that the inconsistency should have alerted jail employees that Nethercutt had a propensity of violence and posed a risk to the other inmates is, at best, speculative.  There is no evidence in the record which supports Smith's theory.

Smith's next argues that "Jailer Hensley and his deputies were deliberately indifferent to a substantial risk of harm to Mr. Smith and had a policy or custom of ignoring jail safety measures." [Docket No. 27].  Smith's conclusory assertion is not enough to withstand Rule 56 scrutiny.  Further, Smith conflates the potential liability of individual deputy jailers, none of whom are before this Court, with the potential individual liability of Hensley as their supervisor, and, in turn, confuses the potential individual liability of Hensley as a supervisor with the

potential liability of Boyd County. Contrary to Smith's assertion, those are three separate concepts which require distinct legal analyses.

Viewing the facts in a light most favorable to Smith, there is no individual liability on Hensley's part.

## VII.

Smith's claims of negligence fare no better.  Indeed, in his response to Defendants' dispositive motion, Smith does not address the relevant legal analysis for these claims.  His claims are subject to summary judgment for his failure to respond in any meaningful way.

Nonetheless, the Court finds that Smith's state law claims fail on the merits as well.

As discussed *supra*, claims against Hensley in his official capacity are the equivalent to claims against Boyd County. In the context of negligence, Boyd County is entitled to sovereign immunity. County governments in Kentucky are cloaked in immune from negligence claims, unless such immunity is expressly waived. *Schwindel v. Meade County,* 113 S.W.3d 159, 163 (Ky. 2003). Smith has not argued that a waiver is present. As such, Smith's claim of negligence against Boyd County and Hensley in his official capacity fail as a matter of law.

Smith's claim of negligence against Hensley, individually, fails as a matter of law as well. Public officers and employees are entitled to "qualified official immunity" for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith, *i.e.* were not made in "bad faith", and (3) were within the scope of the employee's authority. *Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky. 2001). A discretionary act or function is one that involves "the exercise of discretion and judgment, or personal deliberation, decision, and judgment."  *Id.* at 521-522. A ministerial duty, on the other hand, is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain,

16

and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.*

Conversely, no immunity is afforded for the negligent performance or omissions of a ministerial act, or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive, *i.e.,* again the "bad faith" element. *Id.* at 523. Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was in bad faith. *Id.*

The Kentucky Supreme Court has held that the supervision of prisoners is a discretionary act and entitles those in that position to qualified immunity. *Rowan County v. Sloas,* 201 S.W.3d 469 (Ky.2006). Therefore, even assuming Hensley made any decisions with regard to Smith's or Nethercutt's classification, his actions were discretionary, and he can only be deemed liable if he acted in bad faith. There is nothing in the record which even suggests bad faith, malice or corruption on the part of Hensley pertaining to Smith. As such, Hensley is entitled to qualified immunity as to Smith's claim of negligence against him in his individual capacity.

## VIII.

In the context of summary judgment, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in

17

Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Smith has not.

      Accordingly, **IT IS HEREBY ORDERRED** that Defendants' Motion for Summary Judgment [Docket No. 15] be **SUSTAINED**.

      This 31st day of March 2022.

**Signed By:**

**_Henry R Wilhoit Jr._**

**United States District Judge**